# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Tarontae D. Jackson, | Case No.: 2:22-cv-01289-JAD-MDC |
| Plaintiff | |
| v. | **Order Granting Summary Judgment in Favor of the Defendants and Closing Case** |
| Perry Russell et al., | [ECF Nos. 51, 54, 60] |
| Defendants | |

Former Nevada state prisoner Tarontae D. Jackson brings this pro se civil-rights action against the warden and medical director of the facility in which he was incarcerated, claiming that the way they addressed the COVID-19 pandemic was deliberately indifferent to his serious medical needs.[1] The parties now crossmove for summary judgment. Jackson theorizes that the defendants violated his constitutional rights when they "implemented a policy" to quarantine COVID-19-positive inmates and deny them medical care, causing them to suffer.[2] The defendants argue that they did not personally participate in Jackson's medical care and the record does not show that the COVID-19 policy they implemented violated a constitutional right, and regardless, they are shielded from suit by the doctrine of qualified immunity. They add that Jackson's claim is procedurally barred by the Prison Litigation Reform Act (PLRA) because he failed to exhaust his administrative remedies.[3]

Although Jackson has sufficiently shown that his facility's grievance process was unavailable to him to avoid summary judgment for failing to exhaust administrative remedies,

---

[1] ECF No. 14 (third-amended verified complaint).

[2] ECF No. 51 at 4 (plaintiff's motion for summary judgment).

[3] ECF No. 54 at 2 (defendants' motion for summary judgment).

the record establishes that neither defendant personally participated in Jackson's care, and it does

not show that the policy he accuses them of implementing violated a constitutional right. Plus,

even if Jackson could show that the defendants were deliberately indifferent to his serious

medical needs, they are shielded from liability based on qualified immunity. So I grant the

defendants' motion for summary judgment, deny Jackson's, and close this case. [4]

## Background

### A. Nevada Department of Corrections COVID-19 policies and the Stewart Conservation Camp's implementation of them

Perry Russell served as the Warden of Northern Nevada Correctional Center from April

of 2020 to January of 2022.[5] In that role, Russell was responsible for overseeing all aspects of

the Stewart Conservation Camp (SCC).[6]

Dr. Michael Minev was employed as Medical Director for the Nevada Department of

Corrections (NDOC) from October of 2018 to September of 2022.[7] Dr. Minev was responsible

for overseeing inmate healthcare at NDOC institutions and implementing medical policies and

directives.[8] This included NDOC policies and procedures to address the COVID-19 pandemic,

which heavily relied on the CDC's interim guidance.[9] Dr. Minev had to "adapt the [CDC's]

guidance . . . to fit within the realities of the NDOC system" because "the guidance cannot

account for the physical space, staffing, population, and other resources and conditions of all

---

[4] I find these motions suitable for disposition without oral argument. L.R. 78-1.

[5] ECF No. 54-4 at 2, ¶ 2 (Decl. of Perry Russell).

[6] *Id.* at ¶ 4.

[7] ECF No. 54-3 at 2, ¶ 1 (Decl. of Michael Minev).

[8] *Id.* at ¶ 2.

[9] *Id.* at ¶¶ 3–5.

correctional institutions."[10]  He therefore implemented policies consistent with CDC recommendations for correctional centers and that conformed with the realities of the NDOC system.[11]

Under the NDOC policies that Dr. Minev implemented, all inmates had access to hand sanitizer and were allowed to wear masks.[12]  The policies also set isolation and quarantine requirements.[13]  Inmates who tested positive were quarantined, those exposed to the virus were isolated, and new inmates were screened and quarantined at intake.[14]  Neither Russell nor Dr. Minev was personally responsible for providing medical care to inmates at SCC, and neither recalls being made aware of Jackson's grievances.[15]

**B.    Jackson contracted COVID-19 and submitted some grievances.**

Between July 2020 and November 2020, NDOC medical staff provided Jackson with at least four COVID-19 tests while he was at SCC.[16]  He was seen by NDOC medical staff on November 9, 2020, after expressing concern about his breathing and stating that his inhaler was not working.[17]  Medical staff administered breathing treatments and, afterward, Jackson indicated that he was no longer experiencing shortness of breath.[18]

---

[10] *Id.* at ¶ 3 (cleaned up).

[11] *Id.* at ¶ 14.

[12] *Id.* at ¶ 12.

[13] *Id.*

[14] *Id.*

[15] *Id.* at ¶ 15, ECF No. 54-4 at 5, ¶¶ 23–24.

[16] ECF No. 54-5 at 27 (medical report).

[17] *Id.* at 22.

[18] *Id.*

1     On November 28, 2020, Jackson tested positive for COVID-19[19] and was placed in

2  quarantine.[20]  By May 6, 2021, Jackson was offered a COVID-19 vaccine, but he declined it.[21]

3  Almost four months later, Jackson requested the vaccine,[22] and he received his first dose a week

4  and a half later.[23]  He received his second dose about a month after his first.[24]  Jackson was

5  intermittently tested for COVID-19 from May of 2021 to September of 2022.[25]  Then, on

6  September 4, 2022, he tested positive for COVID-19 again.[26]  He was given a "cold set-up" to

7  treat his symptoms and quarantined until he tested negative.[27]

8     SCC's grievance procedures are found in the NDOC Administrative Regulation (AR)

9  740[28] and consist of three steps.[29]  Inmates must first file an informal grievance within six

10  months of the action giving rise to a medical claim.[30]  The prison has 45 days to respond to that

11  informal grievance.[31]  If the prison denies the informal grievance, the inmate has five days after

12  the receipt of the denial to proceed to the next grievance level.[32]  The inmate can then file a first-

13

14  [19] *Id.* at 32.

15  [20] *Id.* at 21.

   [21] *Id.* at 26.

16  [22] ECF No. 54-6 at 99 (inmate-request form).

17  [23] ECF No. 54-5 at 23.

   [24] *Id.* at 24.

18  [25] *Id.* at 27–28.

19  [26] *Id.* at 28.  In his lawsuit, Jackson challenges only the prison's response to his 2020 COVID-19
   diagnosis.  *See* ECF No. 14 at 3.

20  [27] *Id.* at 15.

21  [28] AR 740.

   [29] AR 740.08–AR 740.10.

22  [30] AR 740.08(4)(A).

23  [31] AR 740.08(12).

   [32] *Id.*

4

level grievance, which the prison has 45 days to respond to.[33]  If the inmate receives another

denial, he has five days to file his second-level (and last) grievance.[34]  The prison then has 60

days to respond to the second-level grievance;[35] if it's denied, the inmate has exhausted his

administrative remedies.  In short, after each denial, the inmate must file his next-level grievance

within five days to exhaust the facility's administrative procedures.

From March 11 to July 25, 2022, Jackson filed five separate informal grievances

regarding the treatment he received after contracting COVID-19 in 2020.[36]  In those grievances,

Jackson recounts being refused care and medication and not being able to purchase medicine

because the facility's canteen store was closed.[37]  And though Jackson appealed one of those

grievances to the first formal level, he did not appeal the denial of that grievance to the second

and final level.[38]  None of the grievances directly mentions either Russell or Dr. Minev, and

there is no evidence in the record that Russell or Dr. Minev was aware of Jackson's grievances.[39]

**C.    Jackson asserts a single claim for deliberate indifference to his medical needs.**

Jackson filed this action in the summer of 2022.[40]  After numerous screenings under the

PLRA, Jackson was left with a single Eighth Amendment claim for deliberate indifference to his

---

[33] AR 740.09(5).

[34] *Id.*

[35] AR 740.10(3).

[36] ECF No. 53-5 at 26, 33; ECF No. 54-10 at 26, 27, 29, 30, 33 (grievance numbers 2006-31-42131 (July 26, 2022), 2006-31-41281 (July 14, 2022), 2006-31-39541 (April 25, 2022), 2006-31-39479 (March 31, 2022), 2006-31-39434 (March 11, 2022)).

[37] *Id.*

[38] ECF No. 54-12 at 24 (NDOC first-level grievance (grievance number 2006-31-41281)).

[39] *Id.*; *see also* ECF No. 54-10 at 26, 27, 29, 30, 33 (grievance numbers 2006-31-42131, 2006-31-41281, 2006-31-39541, 2006-31-39479, 2006-31-39434).

[40] ECF No. 1.

1    medical needs against Dr. Minev and Warden Russell.[41]  Discovery has closed,[42] and all parties

2    now move for summary judgment.

3                                        **Discussion**

4              Defendants argue that they are entitled to summary judgment for three main reasons:

5    (1) Jackson's claims are procedurally barred by the Prison Litigation Reform Act (PLRA);

6    (2) Jackson can't establish a deliberate-indifference claim against them because neither

7    personally participated in his medical care, and the policies and procedures implemented were

8    not deliberately indifferent; and (3) they are shielded from this suit based on the doctrine of

9    qualified immunity.[43]  Because questions of "[e]xhaustion should be decided, if feasible, before

10   reaching the merits of a prisoner's claim,"[44] I first consider whether Jackson's claim is

11   procedurally barred.

12   **A.    Questions of fact preclude the court from disposing of Jackson's claims based on a
            failure to exhaust administrative remedies.**

13
14          ***1.    Prisoners must exhaust all available administrative procedures before filing a
                    lawsuit over prison conditions.***

15          The PLRA requires prisoners to exhaust all available administrative remedies before

16   filing a civil-rights action to challenge prison conditions.[45]  Failure to properly exhaust all

17   available administrative remedies is "an affirmative defense the defendant must plead and

18   prove."[46]  The Ninth Circuit instructed in *Albino v. Baca* that a summary-judgment motion is the

19

20   ───────────────────
     [41] ECF No. 21 (order screening third amended complaint).

21   [42] ECF No. 41.

     [43] ECF No. 56 at 2.

22   [44] *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014).

23   [45] 42 U.S.C. § 1997e(a).

     [46] *Jones v. Bock*, 549 U.S. 199, 204 (2007).

                                            6

proper procedural device to resolve PLRA-exhaustion questions.[47]  "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56."[48]  "The defendant's burden is to prove that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."[49]  Once the defendant has shown that there was an available administrative remedy, the burden shifts to the inmate to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."[50]

>    **2.    *There is a genuine dispute about whether there were administrative procedures available to Jackson that he failed to exhaust.***

Jackson did not exhaust the administrative remedies available to him under the AR.[51] His five informal grievances satisfied only the first of three steps in the grievance process, and Jackson doesn't seriously argue otherwise.  Instead, Jackson appears to contend that circumstances beyond his control prevented him from completing the necessary stages of the grievance process.  According to Jackson, "the reason it took [him] so long" to appeal one of his

---

[47] *Albino*, 747 F.3d at 1168–71 (adopting the "use of a motion for summary judgment, as opposed to an unenumerated Rule 12(b) motion, to decide exhaustion" and explaining that either party "may move for summary judgment on the exhaustion question, followed, if necessary, by a decision by the court on disputed questions of material fact relevant to exhaustion").

[48] *Id.* at 1166.

[49] *Id.* at 1172.

[50] *Id.* (citing *Hilao v. Est. of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) ("Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.")).

[51] *Booth v. Churner*, 532 U.S. 731, 741 n.48 (2001) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

informal grievances to the first formal level was "because staff at SCC told [the inmates that] [such issues] [weren't] grievable issues[,] which misle[]d [him]."[52]  He also "felt like [these] issues [were] way more serious than admin could fix."[53]  He suggests that, due to being mislead by staff, he was unable to file a grievance regarding his COVID-19 claim until March 11, 2022, therefore missing the deadline and causing his informal grievance to be denied as untimely.  He raised these same roadblocks on his grievance forms.[54]

The Ninth Circuit has occasionally excused a failure to exhaust administrative remedies when the failure is the prison's own fault.  "An inmate is required to exhaust only *available* remedies."[55]  That requires that the procedures "are 'capable of use' to obtain 'some relief for the action complained of.'"[56]  AR 740.08(4)(C) provides that "[w]hen a grievance cannot be filed because of circumstances beyond the inmate's control, the time will start from the date in which such circumstances cease to exist," and inmates have six months after that date to file an informal grievance for it to be considered timely.[57]  In *Ross v. Blake*, the Supreme Court provided a non-exhaustive list of "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."[58]  That list includes "when prison

---

[52] ECF No. 54-12 at 7 (NDOC grievant's statement-continuation form).

[53] ECF No. 56 at 2.

[54] *See* ECF No. 54-12 at 7; ECF No. 56 at 2.

[55] *Albino*, 747 F.3d at 1171 (emphasis in original) (citing *Booth*, 532 U.S. at 736; *Brown v. Valoff*, 422 F.3d 926, 936–37 (9th Cir. 2005)).

[56] *Id.* at 633 (quoting *Booth*, 532 U.S. at 738).

[57] AR 740.08(4)(A).

[58] *Id.*

1    administrators thwart inmates from taking advantage of a grievance process through

2    machination, misrepresentation, or intimidation."[59]

3        Jackson has met his burden to show "that there [was] something in his particular case

4    that" thwarted him from exhausting the facility's administrative remedies.[60]  "[T]he ultimate

5    burden of proof remains with the defendant,"[61] and here the defendants do not address Jackson's

6    assertion that he was misled by SCC staff.[62]  So I cannot conclude on this record that Jackson's

7    claim is barred by his failure to exhaust.

8    **B.    The defendants are entitled to summary judgment in their favor because the record
         does not establish their liability under any applicable theory.**

9

10        *1.    To obtain summary judgment on a claim, a defendant must defeat just one
                 essential element.*

11        Summary judgment is appropriate when the pleadings and admissible evidence "show

12   that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

13   matter of law."[63]  Defendants moving for summary judgment need only defeat one element of a

14   claim to garner summary judgment on it because "a complete failure of proof concerning an

15   essential element of the [plaintiff's] case necessarily renders all other facts immaterial."[64]  When

16   considering summary judgment, the court views all facts and draws all inferences in the light

17   most favorable to the nonmoving party.[65]

18

19   _____

     [59] *Id.*

20   [60] *Albino*, 747 F.3d at 1172.

21   [61] AR 740.08(4)(A).

22   [62] *See* ECF No. 54 at 20–23; ECF No. 53 at 8–9; ECF No. 58 at 7–9.

     [63] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

23   [64] *Id.* at 322.

     [65] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

2.     ***Russell and Dr. Minev are entitled to summary judgment because the record does not show that they were deliberately indifferent to his medical needs.***[66]

To prevail on a civil-rights claim based on inadequate medical care, an inmate must show that prison officials were deliberately indifferent to his serious medical needs.[67]  This requires a showing that the defendant denied, delayed, or intentionally interfered with medical treatment and that the delay or interference caused further injury.[68]  Indifference to a prisoner's medical needs must be substantial; negligence, medical malpractice, or even gross negligence are insufficient to establish deliberate indifference.[69]  A mere difference of medical opinion likewise does not suffice.[70]  A prisoner must instead show that the course of treatment chosen was medically unacceptable under the circumstances and taken in conscious disregard to his health.[71]

When the defendant is a supervisor, he can be held liable under § 1983 based on either of two circumstances: (1) he was personally involved in the constitutional deprivation, or (2) there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."[72]  "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so

---

[66] Jackson doesn't specify whether he sues Minev and Russell in their individual or official capacities.  But I liberally construe his claims as ones against the defendants in their individual capacities only because Jackson seeks only monetary damages against them.  Official-capacity suits are essentially suits against the state, and states cannot be held liable for monetary damages under § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 & 71 n.1 (1989).

[67] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[68] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

[69] *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

[70] *See Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

[71] *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

[72] *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (cleaned up).

1  deficient that the policy itself is a repudiation of constitutional rights and is the moving force of
2  the constitutional violation."[73]

3      It is that second supervisor-liability theory that Jackson relies on here.  He claims that the
4  defendants "actually denied necessary medical care"[74] because they "implemented a policy to
5  quarantine inmates who had contracted COVID-19 together and left [them] to get better without
6  any medical care."[75]  He theorizes that, "as a direct result of this policy, [he] did not receive any
7  medical treatment for COVID-19 and [] continued to suffer in extreme pain."[76]  Jackson
8  acknowledges that Russell and Dr. Minev are best characterized as "supervisors"—they weren't
9  directly involved in administering his medical care—but insists that the COVID-19 policy they
10  implemented was the "moving force" behind the deliberately indifferent denial of his medical
11  care.[77]

12      But Jackson has not shown that the policy violated a constitutional right.  Dr. Minev
13  acknowledges that quarantining inmates with positive test results was part of NDOC's response
14  to COVID-19.  But Jackson points to no portion of that policy that could be interpreted to direct
15  NDOC medical staff to completely deny medical care to quarantined inmates, nor does he show
16  that the policy of quarantining inmates, as recorded by the CDC, was itself deliberately
17  indifferent to his medical needs.  The defendants, on the other hand, have supplied evidence
18  showing that the quarantine policies they implemented were based on CDC guidance and created
19  in consultation with nursing staff and disease-control specialists at a time when what was known

20

---

21  [73] *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (cleaned up).

   [74] ECF No. 51 at 2.

22  [75] *Id.* at 4.

   [76] *Id.*

23  [77] *Id.*

11

1    about COVID-19 treatment was in flux.  Jackson presents no evidence to suggest that the

2    quarantine policy was medically unacceptable under the circumstances that existed in November

3    2020.

4          Nor has Jackson shown that Russell or Dr. Minev personally deprived him of medical

5    care when he was quarantined.  There is no evidence that Russell or Dr. Minev knew about

6    Jackson's COVID-19 diagnosis, any of his medical kites, or his grievances related to his care.

7    Both Russell and Dr. Minev declare that they do not recall being notified by Jackson that there

8    were issues regarding his medical care.  Jackson never filed a kite addressed to (or mentioning)

9    either defendant.  Though Dr. Minev was tasked with implementing medical policy and

10   directives for inmates, his job responsibilities did not include providing medical care for inmates

11   on an individual basis.[78]  And Russell, as warden, was also not tasked with providing any

12   individualized medical care.[79]  So, because Jackson has not shown that NDOC's quarantine

13   policy caused a constitutional deprivation or that Russell and Dr. Minev personally participated

14   in Jackson's medical care, Jackson cannot prove his deliberate-indifference claim against either

15   of them, and summary judgment is warranted.

16

**C.    Even if Jackson could establish a constitutional deprivation, the defendants are**
17         **shielded from liability based on qualified immunity.**

18         Even if Jackson could establish a constitutional violation, the defendants enjoy qualified

19   immunity from this lawsuit.  "Qualified immunity protects government officers 'from liability

20   for civil damages insofar as their conduct does not violate clearly established statutory or

21

22

23   [78] ECF No. 54-3 at 1.

   [79] ECF No. 54-4 at 1.

1 constitutional rights of which a reasonable person would have known.'"[80]  "To determine

2 whether an officer is entitled to qualified immunity," the court asks, in the order it chooses, "(1)

3 whether the alleged misconduct violated a right and (2) whether the right was clearly established

4 at the time of the alleged misconduct."[81]  "A government official's conduct violates clearly

5 established law when, at the time of the challenged conduct, [t]he contours of [a] right [are]

6 sufficiently clear that every reasonable official would have understood that what he is doing

7 violates that right."[82]

8        The plaintiff bears the burden of showing that the rights at issue were clearly established

9 at the time of the defendant's actions.[83]  He need not identify a case "directly on point, but

10 existing precedent must have placed the statutory or constitutional question beyond debate."[84]

11 The Supreme Court of the United States has cautioned lower courts to avoid addressing qualified

12 immunity at a high level of generality.[85]  Courts must consider the specific facts of the case and

13 determine whether an official would know his or her actions violated clearly established law in

14 those particular circumstances.[86]  A defendant will be entitled to qualified immunity even if he

15 was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable.[87]

16

17

---

18 [80] *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

19 [81] *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

20 [82] *Ashcroft v. al-Kidd*, 565 U.S. 731, 741 (2011) (quotation omitted).

[83] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

21 [84] *Id.*

22 [85] *Id.*; *see also Sheehan v. Cty. of San Francisco*, 575 U.S. 600, 613 (2015); *Kisella v. Hughes*, 584 U.S. 100, 103 (2018).

23 [86] *City of Escondido v. Emmons*, 586 U.S. 38, 43–44 (2019) (per curium).

[87] *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003).

Russell and Dr. Minev argue that they are shielded from Jackson's claim based on qualified immunity because "[t]here is no law providing clear notice to [the] [d]efendants that their conduct would be considered unlawful."[88]  They contend that Jackson cannot show that he had a clearly established right to treatment outside of what he received.  Jackson responds that "Russell and Minev implemented a policy to quarantine inmates who had contracted COVID-19 together and left [them] to get better without any medical care."[89]  He does not argue that the defendants strayed from NDOC protocols.  And he doesn't point to any case law that shows that he had a clearly defined right to different treatment than he received under NDOC's protocols.  Jackson has therefore failed to show that the defendants violated a clearly established right.  So even if I weren't granting summary judgment based on the lack of proof of liability, I would dismiss this suit based on qualified immunity.

### Conclusion

IT IS THEREFORE ORDERED that Tarontae D. Jackson's motion for summary judgment **[ECF No. 51] is DENIED**, and Perry Russell and Michael Minev's motion for summary judgment **[ECF No. 54] is GRANTED**.  The Clerk of Court is directed to **ENTER JUDGMENT in favor of the defendants and CLOSE THIS CASE.**

Jackson also asks for a one-time copy of the docket sheet for this case.  As a one-time accommodation to him, his request **[ECF No. 60] is GRANTED**, and I direct the Clerk of Court to **PRINT and SEND Jackson a copy of the full, public docket sheet in this case.**

_____
U.S. District Judge Jennifer A. Dorsey
January 8, 2025

---

[88] ECF No. 54 at 20.

[89] ECF No. 51 at 4.

14